<hr/>

## JACK MERRILL v. THE STATE.

1. **EVIDENCE.** *Homicide.   Copy of writing containing dying declarations.*
   It is not error, in the trial of a charge of homicide, to admit in evidence a true copy of a writing containing the 'dying declarations of the victim, if the original be admissible, where such copy was made under the belief that the original, having been written with a pencil, was of no value, and the latter has been lost.

2. **SAME.** *Homicide.   Dying declarations, when admissible.*
   It is error to admit as evidence, in a trial for homicide, the dying declarations of the victim to the effect that two weeks before the perpetration of the deed the defendant had made threats against his life; because such threats constitute no part of the *res gestœ*, and the admission of the dying declarations should be restricted thereto.

3. **SAME.** *Murder.   Practice.   Leading question.*
   M. being on trial for the murder of P., S., a witness for the State, testified that P., *in articulo mortis*, told him "that M. had shot him, and that he would not get over it." The district attorney then asked the witness, "Did P. tell you who shot him, after he told you he would not get over it?" The defendant objected to the question as leading, but the objection was overruled, and the witness answered, "He did." *Held*, that the objection was properly overruled.

ERROR to the Circuit Court of Issaquena County.

Hon. B. F. TRIMBLE, Judge.

In order to fully comprehend the points decided in this case it is only necessary to know, in addition to what is stated in the opinion of the court, that after Robert B. Shields, a witness for the State, had testified in the trial in the Circuit

Court that when Peterson, the victim of the crime charged, told him " that Jack Merrill had shot him, and that he would not get over it," the district attorney then asked the witness the question: " Did Peterson tell you who shot him, after he told you he would not get over it?" The defendant objected to the question as leading, but the court overruled the objection, and the witness answered, " He did." The action of the court in overruling this objection is one of the grounds assigned for error.

*J. L. Chapman* and *Murray Peyton*, for the plaintiff in error.

1. The court erred in admitting the copy of the dying declarations. If the declarations of the deceased at the time of his making them be reduced to writing, the written document must be given in evidence, and no parol testimony respecting its contents can be admitted; and if declarations *in articulo mortis* be taken down in writing, signed by the party making them, the judge should neither receive a copy of the paper in evidence nor receive parol evidence of the declarations. 1 Whart. Cr. Law, 680.

2. The verdict was contrary to the law and evidence, and the court erred in refusing to grant the motion for a new trial.

*Frank Johnston*, on the same side.

The rule as to the admission in evidence of dying declarations contained in a writing is that the original writing must be produced. 1 Greenl. on Ev., sect. 161; *Rex* v. *Gay*, 7 Car. & P. 230; *Leach* v. *Simpson*, 1 Eng. Law & Eq. 58; *The State* v. *Cameron*, 2 Chand. 172. Or it must be clearly shown that the original cannot be produced, and its absence must be accounted for. 1 Greenl. on Ev., sect. 84. Oral or secondary evidence of such declarations, when competent, is always equivocal, and is to be scrutinized with caution. 1 Cushm. 322.

*T. C. Catchings*, Attorney-General, for the State.

If the rule laid down in *Ben* v. *The State*, 1 Ala. 9, and in 37 Ala. 103, and in *The State* v. *Shelton*, 2 Jones L. 360, is

good law, the Circuit Court committed a fatal error in admitting the dying declarations of the deceased.   It was there held that the declarations must be restricted to the circumstances attending the act and forming part of the *res gestæ*.   Unless this is error, there is no error in the record.

GEORGE, J., delivered the opinion of the court.

The plaintiff in error was indicted for the murder of Claiborne Peterson, and convicted and sentenced to imprisonment in the penitentiary for life.   On the trial the dying declarations of the deceased were introduced in evidence against the prisoner. These declarations were reduced to writing, and sworn to by the deceased.   The paper offered in evidence was not the original, but was proven to be a true copy.   The copy was made under the belief that the original was of no value because written with a pencil.   After the copy was made, the original was not taken care of and was lost.   Under the circumstances, there was no legal objection to the copy as a substitute for the original.   But there was error in admitting the whole of the writing.   That part which stated that about two weeks before the killing the prisoner threatened the deceased was incompetent.

Dying declarations are intrinsically weak, being the statement of a party who is unsworn and not subject to cross-examination.   They are admitted on the ground of " an overruling public necessity for preserving the lives of the community by bringing man-slayers to justice."   *Lambeth's Case*, 1 Cushm. 357.   They are only admitted " in trials for homicide where the death of the deceased is the subject of the charge and the circumstances of the death are the subject of the dying declarations."   *Lambeth's Case*, 1 Cushm. 354. That they should be confined to the *res gestæ* of the killing seems to be well settled, not only by the above quotations, but by decisions of other courts.   See *The State* v. *Shelton*, 2 Jones L. 363 ; *Ben* v. *The State*, 37 Ala. 103.

The objection that a certain question propounded to the witness Shields was leading is without force.

For the error in admitting the whole of the dying declaration, the judgment is reversed and a *venire de novo* awarded.